SAN ANTONIO & ARANSAS PASS RAILWAY COMPANY v.
MRS. BUNNY BROCK ET AL.

Decided March 9, 1904.

**1.—Railway—Master and Servant—Death—Negligence.**

Facts considered and held to support a recovery for damages resulting from death of a watchman on railway bridge run down by train, by reason of negligence in running it at speed prohibited by the rules and without customary signals and in failing to use due care to discover his perilous position or to avoid striking him after discovering it.

**2.—Discovered Peril—Charge.**

A charge that if railway employes operating a train saw a person on the track in time to avoid striking him it became their duty to exercise ordinary care to avoid collision, held not to be upon the weight of evidence when considered in connection with other charges.

**3.—Charge—Evidence—Discovered Peril.**

Evidence considered and held sufficient to justify the submission of the issue of negligence in the duties arising from the discovery of the perilous position of a watchman on a railroad bridge by the engineer of a train, though the engineer denied having discovered it in time,—there being circumstances tending to show the contrary.

**4.—Persons on Track—Lookout.**

At points where persons may be expected to be rightfully found on the track, those operating railway trains must exercise ordinary care in keeping a lookout for them.

**5.—Contributory Negligence.**

Evidence considered, in case of a watchman on railway bridge run down by train, and held to show circumstances under which the question of his contributory negligence was one of fact for the jury, involving the effect of omission of usual signals, and his right to rely on them and to expect the train to be run within the speed limit required by the rules.

**6.—Negligence—Master and Servant—Assumed Risk.**

Where a judgment for death of a servant is sustained on the ground that the injury was caused by negligence of another employe (not his fellow servant) and without contributory negligence of deceased, no question of assumed risk is involved; risks arising from such negligence are not assumed by the servant.

ON MOTION FOR REHEARING.

**7.—Death—Damages—Charge.**

A charge that the damages, recoverable for the death of a relative should be the "pecuniary loss, if any, sustained by the plaintiffs by reason of the death," was not erroneous in the absence of request for a charge limiting recovery to the present value of the future benefits reasonably to be expected had he not been killed.

Appeal from the District Court of Milam. Tried below before Hon. J. C. Scott.

*Duncan, Walters & Lane,* for appellant.

*T. S. Henderson* and *Freeman & Morrison,* for appellee.

FISHER, CHIEF JUSTICE.—This is a suit by Mrs. Bunny Brock in her own behalf, and as next friend for her children, W. F., Mildred and J. E. Brock, to recover damages in the sum of $30,000, for the death of her husband, John Brock, which occurred on the 8th day of April,

1903, by an engine of one of appellant's passenger trains striking and throwing said Brock from the Little River bridge, thereby causing his death.

Appellant pleaded assumed risk and contributory negligence, and denied the negligence alleged by the plaintiff.

The appellant is charged with negligence in running its train at an unusual and too rapid rate of speed across the bridge, and that Brock was seen in time to have prevented striking him, or that he could have been seen by the use of ordinary diligence upon the part of the engineer, by keeping a reasonable lookout to discover his presence, and that the train approached the bridge without giving the usual and customary signals or ringing the bell or blowing the whistle.

Verdict and judgment were in favor of appellees for the sum of $8000, which was apportioned among them. The verdict and judgment are sustained by the following facts:

John Brock, the deceased, was the husband of Mrs. Bunny Brock, and her coplaintiffs are the minor children of the marriage. At the time the deceased was killed and before, he was a bridge watchman in the service of appellant, it being his duty to guard the Little River bridge from fire. There were some other duties concerning the bridge which he was chargeable with, which are immaterial, and need not be noticed in disposing of this case. His duties required him to pass over the bridge after the passage of each train, and he was especially required to be at the south end of the bridge with his lantern lit, displaying a white light, so that the engineer of the north-bound passenger train could see the same, which train was due to arrive at the south end of the bridge about half past 2 o'clock in the morning. He had special directions from the officials of the railway company who were charged with the duty of directing his movements, to be at the south end of the bridge at that time. The train going north was usually on time. The passenger train going south was due to arrive at Cameron, a few miles north of the bridge, about 1:37 in the morning; but this train was usually and generally from thirty minutes to a few hours late, and upon the night that Brock was killed this train was thirty minutes behind time.

Brock and his family lived in a house furnished by the railway company at the north end of the bridge, about a hundred yards from where it commenced. The house was within a few feet of the track. On the night that he was killed it was his duty to go to the south end of the bridge in order to be there with his light displayed when the north-bound passenger train should arrive; and, in pursuance of this duty, he left his house on a velocipede, which was furnished to him by the railway company, for the purpose of passing over the bridge, a few minutes after 2 a. m. When the southbound train was not on time, it was usual and customary for him to leave his house a little after 2 o'clock, for the purpose of going to the south end of the bridge, in order to comply with his instructions to meet the north-bound passenger train.

The night that he was killed, when he started over the bridge south on the velocipede, he placed his lantern with a white light at the rear end. The light was then burning, and the evidence tends to show that it could have been seen by the engineer and fireman operating the train from the north.

The watchman's house where Brock resided is about 100 yards from the end of the bridge, and north of the house a train can be seen about 350 feet. Brock was struck and killed by the south-bound passenger train about 2:18 o'clock in the morning, when he was on the bridge on his velocipede, going to the south end thereof, in order to meet the north-bound passenger train. The bridge was about a mile and a quarter long, and Brock was killed about 1500 yards from its north end. From about his residence at the north end of the bridge to the point where he was struck, the track is straight; and it does not appear from the evidence that there was anything to obstruct the view of the engineer. The headlight on the locomotive that struck him was burning and appears to have been in good condition. Also it appears that the brakes and appliances for stopping the train were in proper condition.

The facts authorize the conclusion that the engineer operating the locomotive pulling the train going south that struck Brock, knew that Brock's duties required him to be at the south end of the bridge when the north-bound train should pass; and the inference to be drawn from the evidence is that he knew that Brock lived at the north end of the bridge, and that he was charged with the duty of crossing the bridge for the purpose of inspecting it, in order to guard against fire. It was usual and customary for the train approaching from the north to sound the whistle in approaching the bridge and to ring the bell when passing Brock's residence; and there were instructions to the effect that such train should slow down to a speed of from twenty-five to thirty miles an hour in crossing the bridge. There is evidence to the effect that on the night in question, on the approach of the train coming from the north at the bridge, the whistle was not sounded nor was the bell rung when the train was passing the house of the watchman.

There is also evidence to the effect that the train, in approaching the bridge and passing over the same, was running at a high rate of speed, between forty and fifty miles an hour, which was in excess of the usual schedule rate. And there is evidence showing that the whistle was not blown after the train went upon the bridge. The train at the time that it passed over the bridge was about thirty minutes late. The passenger train coming north was on time. The south-bound train that killed Brock did not stop when the collision occurred, but passed on and met the north-bound train at Minerva, a few miles south of the bridge.

There is evidence which tends to show that the engineer operating the south-bound train could, if a proper lookout had been observed, have seen the deceased Brock on the bridge in time to have stopped his engine; and in view of some evidence and circumstances in the record, the

conclusion is warranted that he did see Brock in time to have prevented running him down, although this fact is denied by the engineer. And it also appears that if the whistle had been sounded and the bell rung,— the usual warning of the approach of the train to the bridge,—and the train had been running at its usual rate of speed in passing over the bridge, that Brock could have escaped the collision, as it appears from the evidence that there were places along the bridge where he could have placed himself, and thereby have avoided being struck by the train. When he went upon the bridge in discharge of his duty to go to its south end to meet the north-bound passenger train, it does not appear that he was aware of the approach of the south-bound train. It was his custom and habit to leave his residence at the north end of the bridge, to go to the south end, a few minutes past 2 o'clock.

Therefore, from the facts as stated, we reach the conclusion that the acts of negligence, as above stated, are sustained by the evidence, and that some or all of these were the proximate cause of Brock's death. And the evidence also authorizes the conclusion that he was not guilty of contributory negligence, as charged in the defendant's answer. Nor was his death the result of one of the risks assumed by him, but was directly attributable to the negligence, as indicated by the facts stated.

Appellants first, second, third, fourth, fifth, sixth and seventh assignments of error are disposed of by our findings of fact.

The fifteenth assignment of error is too general to be considered.

The charge complained of in the eighth assignment of error was proper. The jury could not have misunderstood the charge, and it did substantially state the questions for their consideration.

The ninth assignment of error complains of the charge of the court which submitted to the jury the issue of discovered peril. This charge is to the effect that if the employes in charge of the train saw Brock in time to avoid striking him, it became their duty to exercise ordinary care under the circumstances to use means to avoid the collision. This branch of the charge, when considered in connection with the other charges given by the court, is not upon the weight of evidence, as is contended by appellant. The principal ground urged against it is that there was no evidence showing that the employes saw Brock in time to avoid striking him. The engineer testified that he did not discover the presence of Brock upon the bridge until he had gotten in about 100 feet of him, and then says that he sounded the whistle and used the appliances to stop the train.

There is no direct evidence contradicting the engineer upon this subject, but there are some facts and circumstances which have a tendency to show that he did see Brock in time to have stopped his train, if it had been running at the rate testified to by the engineer, which he testifies was about twenty-five or thirty miles an hour. From the time that he reached Brock's residence beyond the north end of the bridge the track was straight to the point where Brock was struck, and there was

nothing to obstruct the view of the engineer. The facts indicate that he knew that the bridge was guarded by a watchman, and that it was his duty to be at the south end of the bridge when the north-bound train passed. He knew the fact that he was behind time, and that the north-bound train had the right of way, as shown by his testimony, and it would be expected to reach the south end of the bridge a short while after his train should pass over it. There is a part of his testimony which tends to show that on the night in question, in passing over the bridge, he was performing his duty as an engineer in the regular and ordinary way, and if such was the case, knowing the possibility or the probability that the watchman might be on the bridge, it is reasonable to suppose that the engineer kept a lookout. The lantern carried by Brock, which was placed at the rear and north end of the velocipede as he left home going on the bridge, was burning when he went on the bridge, and when he was last seen upon it by his wife, according to the testimony of the plaintiff Mrs. Brock. If this light was burning at the time that the engineer got in sight of the bridge with a straight track ahead of him for a mile and a quarter, there was nothing to prevent him from seeing the light in approaching the bridge, and thereby have stopped his train before reaching Brock.

The evidence upon this subject warranted the jury in believing that the light was burning when Brock was passing over the bridge on the velocipede. With this view of the facts, the jury were not bound to accept as true the statement of the engineer to the effect that he did not see Brock before he got within 100 feet of him. Brown v. Griffin, 71 Texas, 659.

The tenth assignment of error complains of the charge of the court wherein was submitted to the jury the act of negligence in running the train at an unusual and high rate of speed, and of the failure of those operating the same to exercise ordinary care in keeping a lookout to discover if Brock was on the bridge, and in failing to give the signals in approaching the bridge.

Our findings of fact dispose of these questions as raised in this assignment. There is evidence to the effect that in crossing the bridge the engineer was causing the train to be run at an unusual rate of speed, and that in approaching the bridge, and after getting upon it, he failed to give the usual and customary signals of warning of his approach. And there is a theory of the case raised by the evidence that would authorize the jury to conclude that if he did not actually see the deceased in time to prevent running him down, he could have discovered his presence on the bridge by the exercise of ordinary care in keeping a lookout. There is no escape from the conclusion that the engineer knew that the bridge in question was frequently passed over by the watchman, and that this was required to be done by the watchman in the performance of his duties.

The rule is well settled that at places where it is expected that persons will be rightfully found upon the track, ordinary care under the cir-

cumstances must be exercised to keep a lookout for them. St. Louis S. W. Ry. Co. v. Arnold, 32 Texas Civ. App., —, 74 S. W. Rep., 821, and St. Louis S. W. Ry. Co. v. Jacobson, 28 Texas Civ. App., 150, 66 S. W. Rep., 1113.

What we have said practically disposes of the eleventh assignment of error. This assignment, together with an objection to the charge considered under the tenth assignment of error, also raises the question that the court erred in submitting to the jury as an issue the contributory negligence of the deceased Brock. The appellant's contention is that the evidence clearly shows that Brock was guilty of contributory negligence. We can not accept this view of the evidence. Brock's duties required him at the time he went upon the bridge, to go to its south end, in order to meet the north-bound passenger train. He started at his usual and customary time. There was no warning given of the approach of the train, and it appears that he had passed over about 1500 yards of the bridge before he was struck.

In considering the question whether he was in the exercise of ordinary care in going upon the bridge at the time he did, the jury had the right to consider in passing upon the issue of contributory negligence, the question whether Brook was, under the circumstances, justified in relying upon the fact that the engineer operating the south-bound train would give the usual and customary signals in approaching the bridge, and would run at the usual and customary speed, and would keep a proper lookout for his safety. If at the time that Brock went upon the bridge there was nothing to indicate the danger of doing so by the approach of a train from the north, it was not unreasonable for him to rely upon the fact that the usual signals and warning would be given to indicate the approach of the train, and that it would be run at the reasonable schedule rate, so as to be under the control of the engineer, whom he had the right to suppose would keep a reasonable lookout for him.

When signals and warnings are usually given, or a limited speed is required at certain places, one going rightfully upon the track may, in some instances, assume that these duties will be observed; and we are of the opinion that this is a case in which this rule should be applied. International & G. N. R. R. Co. v. Ives, 8 Texas Ct. Rep., 722; Texas & P. Ry. Co. v. Fuller, 13 Texas Civ. App., 152, 36 S. W. Rep., 319; Carriway v. Houston & T. C. Ry. Co., 6 Texas Ct. Rep., 524; Missouri K. & T. Ry. Co. v. Cardena, 22 Texas Civ. App., 301.

Whatever question of assumed risk there is in the case was covered by the charge of the court. But, however, in disposing of this question it is only necessary to say that if the judgment can be maintained upon the ground of negligence, as stated, there is no question of assumed risk in the case, for if Brock was injured in the performance of his duty, under circumstances showing that he was not guilty of contributory negligence, by reason of the acts of negligence charged to the appellants

as shown by the evidence, the railway company would be liable. Such risks as arose from the character of negligence charged were not assumed by Brock.

We have considered the questions raised in the twelfth, thirteenth and fourteenth assignments of error, and in our opinion they present no reversible error.

We find no error in the record and the judgment is affirmed.

*Affirmed.*

### OPINION ON REHEARING.

FISHER, CHIEF JUSTICE.—The trial court gave the following charge on the measure of damages: "If you find for the plaintiffs, it will be your duty to ascertain from the evidence what pecuniary loss, if any, has been sustained by the plaintiffs by reason of the death of said Brock, and you will make that sum the amount of your finding. The plaintiffs are not permitted to recover anything on account of grief, nor on account of the loss of the society of the said Brock; but their right to recover, if any, then must be limited to the pecuniary loss sustained."

Appellant complains that this charge does not present the correct measure of damages, in that it fails to instruct the jury that the appellees can only recover such sum as would be a present compensation then paid for all of the future contributions and benefits they had a reasonable expectation of receiving from Brock, had he lived. No additional charge was requested by appellant upon this subject. The charge as given limits the liability of the appellant to the pecuniary loss sustained by the appellees by reason of the death of Brock, and this we understand to be the extent of recovery allowed by law. They were certainly entitled to recover for the pecuniary loss sustained by reason of the death of the husband and father; and we are of the opinion that while the rule contended for by the appellant is correct, a request should have been made that it be submitted to the jury. The facts do not suggest that in determining what was the pecuniary loss sustained by the plaintiffs, the jury awarded more than what would be a sum then paid as a present compensation for the future contributions and benefits they had a reasonable expectation of receiving from the deceased Brock, had he lived. And in this connection it is well to say that there is no assignment complaining that the verdict of the jury exceeded the amount that the plaintiffs would be justly entitled to as compensation.

Motion for rehearing is overruled.

*Overruled.*

Writ of error was refused by the Supreme Court, May 5, 1904.